**DOBBS HOUSES, INC., a Division of Squibb-Beechnut, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 20700.

United States Court of Appeals, Sixth Circuit.

June 4, 1971.

Paul O. Miller, III, Memphis, Tenn., for petitioner; Bowling, Brackhahn, Miller & Jackson, Richard A. Brackhahn, Memphis, Tenn., on brief.

Marjorie S. Gofreed, N. L. R. B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Cranof, Atty., N. L. R. B., Washington, D. C., on brief.

Before EDWARDS, CELEBREZZE and BROOKS, Circuit Judges.

EDWARDS, Circuit Judge.

Petitioner Dobbs Houses, Inc., seeks review of an order of the National Labor Relations Board requiring petitioner to cease and desist from its refusal to bargain with a union, in violation of § 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (5) (1964). The NLRB cross-petitions for enforcement of its order. 183 N.L.R.B. No. 63 (June 17, 1970).

The union[1] had previously been certified by the NLRB after it won a Board-conducted election by 57 to 1. The employment unit involved consists of all production and maintenance employees of the Dobbs Houses catering unit at the Memphis International Airport. The catering unit supplies the meal service for all ten of the airlines which operate out of the Memphis Airport.

Prior to the representation election, Dobbs Houses had objected on the ground that its operation and employees were subject to the jurisdiction of the Railway Labor Act, 45 U.S.C. § 151, et seq. (1964), rather than the National Labor Relations Act. After certification petitioner refused to bargain on the same ground.

The basic issue in the case is whether or not Dobbs Houses is subject to the jurisdiction of the Railway Labor Act, or whether or not Dobbs Houses' employees are so subject. Petitioner also argues that the NLRB should have let the National Mediation Board make the initial determination on this topic. It is conceded that Section 2(2) and (3) of the NLRA, 29 U.S.C. § 152(2) and (3) (1964), exclude employers and employees who are subject to the Railway Labor Act from NLRB jurisdiction. It is also conceded that carriers by air have been placed under the jurisdiction of the Rail-

---

1. Highway and Local Motor Freight Employees Local Union No. 667, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

way Labor Act, 45 U.S.C. § 181, et seq. (1964).

The controlling statutory language therefore is found in the Railway Labor Act as follows:

"First. The term 'carrier' includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such 'carrier': * * *

* * * * * *

"Fifth. The term 'employee' as used herein includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect, and as the same may be amended or interpreted by orders hereafter entered by the Commission pursuant to the authority which is conferred upon it to enter orders amending or interpreting such existing orders: * * *" 45 U.S.C. § 151 (1964).

"All of the provisions of sections 151, 152, and 154–163 of this title are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce, and every carrier by air transporting mail for or under contract with the United States Government, and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to

its or their continuing authority to supervise and direct the manner of rendition of his service." 45 U.S.C. § 181 (1964).

The facts bearing upon the jurisdictional issue were found by a hearing officer for the NLRB at the time of the representation proceeding as follows:

"The Employer is a Tennessee corporation engaged in the restaurant and airline catering business at numerous airports throughout the country. Its restaurant operation and catering service constitute separate national operating divisions, and it employs approximately 90 employees in its restaurant operation and approximately 70 in the catering operating at the Memphis International Airport, the only location involved herein.

"The parties stipulated that the Employer's gross revenues during the past 12 calendar months exceeded $500,000 and that during the same period it purchased from sources located outside the State of Tennessee goods valued in excess of $50,000. However, the Employer did not concede that the Board had jurisdiction and, instead, moved that the petition be dismissed on the ground that the Employer and the catering employees sought by the petition are subject to the jurisdiction of the Railway Labor Act and, therefore, under Section 2(2) and 2(3) of the Act, the Board lacks jurisdiction over this proceeding. In the alternative, the Employer moved that the Board certify the case to the National Mediation Board for a determination of its jurisdiction over the Employer and its employees under the Railway Labor Act. The Petitioner disagrees, asserting that the Employer and its catering employees are subject to the jurisdiction of the Act. The Employer's restaurant and catering operations constitute separate divisions, and neither party contends that the restaurant employees are not employees within the meaning of the Act.

"The Employer's Memphis catering operations involve the preparation of

food in its airport kitchens and the transportation of food and beverages from its facilities at the airport to planes and the return of soiled equipment to its kitchens which are located at the airport. Although the Employer provides food and catering services for all airlines operating out of the Memphis airport, it has not been certified by the Civil Aeronautics Board as a common carrier by air. The Employer leased its operating space from the City of Memphis as do all the airlines and owns all equipment used in its operations except the equipment used aboard planes which is owned by the respective airlines.

"The Employer's relations with the airlines are established by oral contracts and detailed specifications or manuals, which set forth in detail instructions regarding the catering operation as it relates to the particular airline. These instructions include the make up of menus, the manner of food and beverage preparations, the size of meals and the manner and means by which the food should be loaded on the planes. Representatives of the respective airlines have unlimited access to every phase of the catering operations and regularly inspect the food preparation and the loading operation to insure that the specifications of the airlines are observed. When an airline representative observes a deviation from the specification, he may suggest a correction to the employee involved, or he may authorize the employee to deviate from the specifications without consulting with the Employer's supervisors. However, the representative has no authority to take direct action against the employee for violations of the specifications. He can only make recommendations or reports to the Employer's supervisors regarding the kitchen operation.

"While the airlines representative may give direct orders to the employees engaged in the loading operations, he does so only when he observes violations of the specifications which could lead to an accident. Otherwise, he will caution the employees or report the incident to the Employer. Each airline may remove an employee involved in the loading operation from working on its planes, but cannot prohibit his servicing other airlines. In addition, each airline requires proof that each of the Employer's drivers working on its planes are qualified.

"The Employer maintains that the airlines can exercise final control over an employee's employment and points out 10 incidents which occurred in the catering division at locations other than Memphis wherein employees have been discharged, allegedly at the request of the airlines. These incidents involved the termination of two employees in Chicago in 1969 after they were reported by Delta Air Lines for theft; two others in Chicago in 1967 and 1969, respectively, who were reported by the same airline as having unlawful possession of goods taken from interstate shipments; four at St. Louis, of whom two were discharged at the request of Eastern Airlines, and two at the request of Trans World Airlines, for having violated safety regulations or for having been involved in aircraft accidents, and one was discharged in Atlanta in 1964 at the request of United Airlines after an accident. In addition, when an airline has considered the catering service to be substandard and the airline has threatened to cancel the Employer's account, the managers of the catering operations involved have been transferred. In view of the record testimony which establishes that the airlines do not hire, promote, demote, or control the pay, hours, shifts or working conditions of the Employer's employees, it appears that while the reports or requests by the airlines may have formed the basis for the above-described personnel actions, the decisions to discharge or to transfer were, in fact, made by the Employer's supervisors.

"The record establishes that the terms, wages, hours and working conditions of the employees are controlled and determined by the Employer. In addition it is clear that the airlines do not exercise any continuing authority over

the employees involved whether they be on the airfield or in the kitchen. The record establishes that while the airlines may give direct orders to the Employer's employees during the loading operation, these result generally when an employee's action may lead to accident; otherwise, the airlines report the incident to the Employer's supervisors who take any necessary disciplinary action. The record also establishes that while the airlines may make suggestions to employees working in the kitchen, they have no authority to take action against employees and may only make reports to the employees' supervisors who take any necessary action. Finally, the record establishes that the airlines have no authority to discipline directly the Employer's employees."

While none of the facts recited above appear to be in direct dispute, petitioner contends that ten instances of discharge of its employees at airport operations in other cities illustrate the "control" exercised by the carriers. Petitioner also cites the meticulous specifications of the carriers in relation to the food supplied by it and the detailed rules and regulations which the carriers require petitioner's driver-loaders to follow when approaching or servicing the aircraft.

Petitioner also relies upon the fact that its driver-loaders must comply with Federal Aeronautics Administration regulations and that its catering division is subject to the jurisdiction of the U. S. Public Health Service and the Interstate Carrier Section of the Department of Health, Education and Welfare.

Against this total factual background petitioner contends that in order to be under the jurisdiction of the Railway Labor Act "an employer need not be a carrier by air but may be any company directly or indirectly controlled by or under the common control with any carrier by air," and that similar controls subject its employees to the same jurisdiction.

The ultimate conclusions of the NLRB Hearing Examiner which were subsequently affirmed by the Board were as follows:

"I find that the Employer is not a common carrier and is not arguably subject to the Railway Labor Act. Cf. Wings & Wheels, Inc., 139 NLRB 578, and Bradley Flying Service, Inc., 131 NLRB 437. I further find that the employees of the Employer are neither 'employees' nor 'subordinate officials' of common carriers by air. Even assuming Section 151 (Fifth) of the Railway Labor Act is applicable, the employees of the Employer are not 'in the service of a carrier' nor do they perform 'any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission. * * *' Assuming that Section 151 (Fifth) should be construed to include an employee 'subject to its [a carrier's] continuing authority to supervise and direct the manner of rendition of his service' even if such an employee is not 'in the service of a carrier,' the record in this case is abundantly clear that the employees of the Employer are not subject to the 'continuing authority' of airline personnel. In this connection, I note that the Board has exercised jurisdiction over one of the Employer's airline catering operations. Dobbs Houses, Inc., A Division of Beech-Nut Lifesavers, Inc., 172 NLRB No. 206. The Employer concedes that it has not in the past contended before the Board that the Board did not have jurisdiction over its operations on the ground that its airline catering services were subject to the Railway Labor Act. See Hot Shoppes, Inc., 143 NLRB 578 and Marriott In-Flite Services, Division of Marriott Corporations, 171 NLRB No. 102."

In arguing that this court should reverse these findings petitioner relies upon two airline catering cases where Railway Labor Act jurisdiction was found—in the first instance by the National Mediation Board and in the second by the NLRB. Airline Cuisine, Inc., NMB Case No. R–3489 (June 30, 1961);

Sky Chefs, Inc., Case Nos. 2–RC–1645, 2–RC–2122 (NLRB June 6, 1950). These two cases, however, deal with wholly-owned subsidiaries of air carriers —a fact which establishes *control* beyond any peradventure of a doubt.

Petitioner, however, also cites and relies upon two other cases: the *Fred Harvey* case, cited as Ex parte No. 72 (Sub. No. 1), 231 I.C.C. 91 (1938), and the Ohio & Western Pennsylvania Dock Co., NMB No. C–3748 (June 21, 1967).

In the *Harvey* case, however, there were many distinguishing facts. Harvey supplied the food service for the Santa Fe dining cars and stations. By its contract Harvey could not do any work for anybody other than Santa Fe except by explicit permission from Sante Fe. Santa Fe covered all of Harvey's financial losses in years when there were such and Santa Fe also shared in Harvey's profits in years when there were such. Santa Fe reimbursed Harvey for the total cost of the wages of Harvey's stewards, cooks and waiters. Santa Fe had the explicit right to require discharge of Harvey's employees. In addition, Harvey's employees traveled on the railroad trains themselves and were directly subject to supervision by Santa Fe personnel.

No such facts as these are to be found in the record before us.

Dobbs Houses also relies upon Ohio & Western Pennsylvania Dock Co., NMB No. C–3748 (June 21, 1967). In this case the NMB in holding that "control" within the meaning of the statute was to be found, started by observing that "the Dock Company renders its services for no other company or carrier aside from Pennsylvania Railroad." One of the major distinguishing factors in the Dobbs Houses case from both *Ohio & Western* and the *Harvey* case is the fact that Dobbs Houses at Memphis serves ten of the airlines—all of the airlines which enter the Memphis terminal.

. Further, in determining that "control" within the meaning of the Railway La-bor Act had been established as to the dock company, the National Mediation Board took into account the following facts (among others):

"1. Ownership of the Premises: Pennsylvania Railroad

2. Ownership of the Dock: Pennsylvania Railroad

3. Ownership of the Equipment: Pennsylvania Railroad

4. Use of the Dock: Set aside by the Pennsylvania Railroad for the handling of iron ore upon which the Railroad Company owns the ore handling machinery

5. Intention: "It is the intention of the *Railroad Company* to operate said docks and ore handling machinery * * * to properly and economically handle iron ore from vessels arriving at *its* docks, to cars for direct shipment to the destination of such iron ore, or to the docks for storage and subsequent shipment to destination." (ILA Emphasis)

6. Service of the Company has been performed solely for the Pennsylvania Railroad. (Paraphrasing by Board)

7. (a) Dock Company will unload iron ore with the ore handling machinery.

(b) Dock Company has not and will not acquire any interest, title or ownership in ore being handled.

\* \* \* \* \*

(g) All major repairs, replacements, renewals shall be made by the Dock Company at the Railroad Company's expense or the Railroad Company reserves the right to do such things itself.

(h) The Railroad Company agrees to pay 41% of the wages paid by the Dock Company to any of its employees engaged in the taking of scale readings on (Hulett) machines or on said ore bridge.

(i) The Dock Company maintains and operates the electric locomotives at Dock No. 11, Cleveland, Ohio, etc. and the Railroad Company pays the cost *for maintenance and operation,* and to said costs of Hulett machine scale readers, ore bridge scale readers, electric locomotive operators, are added Social Security, Workmen's Compensation and all other taxes, state or federal to be reimbursed by the Railroad Company. (ILA Emphasis)

\* \* \* \* \*

(*l*) The Dock Company cannot sublet or underlet any of the work without the written approval of the Railroad Company." Ohio & Western Pennsylvania Dock Co., *supra* at 2, 3.

In our instant case no such facts are present. Dobbs Houses leases the premises on which it operates from the City of Memphis; it owns its own equipment; it hires, supervises and fires its own employees; it sells its services to whomever it will and can; it is not reimbursed for its employees' wages or taxes, except in general contract terms; and except in delivering its meals to the aircraft, it is not engaged in any aspect of transportation.

While we recognize that Dobbs Houses is engaged in a business which requires it to please some very meticulous and demanding customers, that fact alone does not establish their "control directly or indirectly" of it or its employees for purposes of the Railway Labor Act. Marriott In-flight Services, Division of Marriott Corporation, 171 N.L.R.B. No. 102, 70 LRRM 1231 (1968); Eastern Aviation Service, Inc., NMB Case No. C–3796 (April 14, 1970); Dispatch Services, Inc., NMB Case No. R–3437 (December 9, 1960).

The findings of fact affirmed by the Board are supported by substantial evidence on the record taken as a whole. They lead to the conclusion that the NLRB has jurisdiction over petitioner and its employees.

Concededly, there is no statutory requirement that this question of jurisdiction be submitted for answer first to the National Mediation Board. And we find no violation of NLRB rule or policy in its decision and order in this case.

The petition to review is denied and cross-petition for enforcement of the Board's order is granted.